IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| **SOUTHWEST RESEARCH INSTITUTE,** *Plaintiff* § § § § § § § § § | SA-20-CV-00986-XR |
| -vs- | |
| **CALIFORNIA FUELING, LLC,** *Defendant* | |

# ORDER

On this date, the Court considered Defendant California Fueling, LLC's Motion to Dismiss for Lack of Personal Jurisdiction or, in the alternative, to Transfer Venue (ECF No. 7), and the response and reply thereto. After careful consideration, the Court will grant the motion to dismiss for lack of personal jurisdiction.

## Background

The State of California has a set of regulations, issued by the California Air Resource Board ("CARB") designed to reduce greenhouse gas emissions. One way CARB seeks to reduce greenhouse gas emissions is by encouraging the use of biofuels. California's Alternative Diesel Fuel ("ADF") regulations require that certain biodiesel blends (biofuel blended with traditional diesel fuel) include a nitrogen-oxide ("NOx") mitigating additive approved by CARB. Defendant California Fueling ("Cal Fueling") was founded in 2017 to create NOx mitigating additives that satisfy California's ADF regulations. Cal Fueling is a California company with its sole place of business in Los Angeles.

Southwest Research Institute ("SwRI") is a Texas company located in San Antonio, Texas. It is one of three testing facilities authorized by CARB to conduct ADF-approval testing for NOx mitigating additives; the other two are the University of West Virginia, and the University of

California Riverside. In 2017, Cal Fueling's CEO, Pat McDuff, traveled to each facility to find one to conduct ADF testing for its additive for CARB approval. According to McDuff, he chose SwRI because of its experience with CARB, the ADF regulations, and because it had the specific diesel engine that CARB required for testing. Def. Ex. B. According to Cal Fueling, SwRI's location was immaterial; the key consideration was that SwRI operated a CARB-approved testing facility and it offered to conduct ADF testing according to California's standards. *Id.*

SwRI and Cal Fueling entered into a contract in October 2017 whereby SwRI would perform emissions testing on Cal Fueling's NOx additive in connection with Cal Fueling's efforts to certify its product in California. At McDuff's request, Bob Fanick, SwRI's Principal Scientist, submitted SwRI's Preproposal EVR-7876 to Cal Fueling on October 24, 2017. Pl. Ex. A-4 (sealed). Fanick told McDuff he could not use the Preproposal unless Cal Fueling would pay the entire amount and agree to other conditions, and it would "be easier for [Fanick] to send the proposal and contract." *Id.* SwRI later sent its form contract to Cal Fueling, and the parties signed the contract on October 30, 2017. McDuff signed the contract in California, scanned it, and returned it to SwRI.

Under the contract, performance would begin "at the earliest practicable date, but in no event prior to the receipt of a signed contract, initial payment (if required), and any required Client provided equipment and materials." Pl. Ex. A-6. "Once started, project performance shall continue for a period of two (2) months unless this performance period is modified by mutual agreement in writing." *Id.* During the project execution, if either party identified a work scope or schedule change, or if there was a delay, SwRI would submit a plan to modify the contract accordingly, using a formal Project Variation Request ("PVR") system to track any changes. *Id.* The contract expressly terminated upon the first of certain events: (1) project completion; (2) expiration of the

performance period specified or subsequently agreed upon; (3) receipt by SWRI of written notice of termination from Client; or (4) receipt by Client of written notice of termination from SwRI (based on certain conditions). *Id.*

SwRI notes that CARB set a deadline of June 30, 2018 for applications for biodiesel certification, and as a result, SwRI's CARB certification work for all its clients, including Cal Fueling, occurred from early 2017 through June 2018. Certification tests are conducted following strict CARB guidelines and protocols. To complete a certification test, SwRI would compare emissions tests (reference tests versus candidate tests) and would replicate this process for seven days, keeping records of the testing in San Antonio. SwRI maintains a diesel engine used exclusively in dedicated testing cells in San Antonio, and all emissions testing SwRI performed in 2017 and 2018 of biodiesel fuel blends with NOx mitigating additives was conducted in the testing cells. According to Cal Fueling, SwRI sent the results of the testing directly to CARB in California.

SwRI performed all the testing for Cal Fueling at its facility in San Antonio in 2017 and 2018. In connection with the contract, Cal Fueling shipped several gallons of its NOx additive to SwRI in San Antonio for use in the testing, and approximately three gallons remain on SwRI's campus. Payment was to be made by electronic funds transfer to SwRI's bank account or by check mailed to SwRI in San Antonio. The contract does not contain a forum-selection clause or a choice-of-law clause.

SwRI began certification testing for Cal Fueling in mid-November 2017, and McDuff traveled to San Antonio to be there for the testing. Between signing the contract and the testing, McDuff sent emails to Fanick asking about filters and who would be performing the testing and what experience they had. Pl. Ex. A-5

3

SwRI eventually performed 10-20 screening tests and three certification tests (in November 2017, April 2018, and June 2018) for Cal Fueling in San Antonio. According to SwRI, McDuff travelled to San Antonio to visit SwRI in November 2017, April 2018, and June 2018 in connection with the testing,[1] and McDuff typically stayed one week per visit. SwRI assigned him a temporary office at SwRI. According to Fanick, "McDuff was hands-on in developing and modifying the precise ingredients of the fuel blends used in screening and certification testing" and "would also personally oversee the tests performed while he was at SwRI's San Antonio, Texas facilities." Fanick Aff. ¶ 13. McDuff directed SwRI with respect to the precise formulation of fuel blends for the certification testing. *Id.* ¶ 16.

Fanick's declaration states that Cal Fueling elected to perform certification testing on a fuel blend after McDuff personally oversaw several screening tests at SwRI in April 2018. Fanick Aff. ¶ 15. Fanick states Cal Fueling and SwRI reached an agreement to modify the contract to include the certification testing while McDuff was in San Antonio. *Id*. According to SwRI, McDuff, while in San Antonio at SwRI, reviewed and signed a contract modification known as a Project Variation Request ("PVR") for the additional CARB certification testing. *Id.* Fanick's declaration states that McDuff requested that he print and provide the PVR to him for review and signature during his April 2018 visit to San Antonio, and includes an email from McDuff to Fanick asking him to print something so that he can sign it. *Id*. SwRI does not submit a signed copy of the PVR, and Cal Fueling contends that the PVR was signed by Yvette McDuff in California. Cal fueling submits an April 2018 PVR signed by Yvette McDuff. ECF No. 16 at 4 n.2 (citing Def. Ex. A para. 6).

---

[1] McDuff's affidavit states he traveled to SwRI two times (dates and lengths unspecified) to observe the testing because SwRI chose to do the testing there. Def. Ex. B. The Court accepts SwRI's facts as true for purposes of this motion. However, SwRI also attempts to rely on McDuff's contracting with SwRI through the National Biodiesel Board and related travel to SwRI in March and April 2017 to establish minimum contacts, but fails to connect these contacts to Cal Fueling, other than through McDuff. At the time, McDuff was working on behalf of Hull Partners, LLC. The Court therefore does not consider the NBB-related contacts as Cal Fueling's contacts for purposes of this motion.

Thus, while McDuff may have asked Fanick to print the PVR so he could sign it, the evidence indicates that Yvette McDuff actually signed it (in California). ECF No. 16 Ex. A.

A second PVR was signed by Fanick and McDuff in early November 2018. The "description of change and proposed resolution" states "addition of four additional days of fueling and screening" and "extend project completion date to 12/31/2018." Def. Ex. B-1.

SwRI completed the testing by November 16, 2018, and Cal Fueling made all payments due under the contract. Fanick Aff. ¶ 21. Six payments were made by wire from California and the seventh by credit card from California. Def. Ex. B ¶ 8. According to Fanick, during the various testing by SwRI, McDuff specifically requested "that particular SwRI employees perform aspects of the testing, the frequency with which filters were changed on the Series 60 diesel engine, and the precise dates that the Testing Cells were reserved and tests performed, typically to match his travel schedule to San Antonio, Texas." *Id.* ¶ 17. McDuff also repeatedly communicated with SwRI employee Robert Finch in connection with testing procedures and the day-to-day and even sometimes hour-by-hour progress of the testing or to receive emission results. *Id.* ¶ 18.

On December 10, 2018, Cal Fueling filed a lawsuit in California against Best Energy Solutions and Technology Corp., Innospec Inc., and numerous Doe defendants. Ex. B-17. Best had obtained CARB certification of its own additive, also using SwRI for the certification testing. The lawsuit raised concerns about the efficacy of Best/Innospec's additive and Best's CARB certification testing and asserted that Cal Fueling had used a third-party testing facility and SwRI to test Best's product and found that Best's product did not work.

In September 2019, McDuff reached out to Fanick seeking documents related to testing conducted by SwRI on certain fuels. *Id.* ¶ 22; Pl. Ex. A-13. McDuff asked for a chain of custody document for EM-9663-F fuel drums. SwRI's counsel emailed McDuff's counsel and asked that

McDuff direct inquiries to counsel rather than to Fanick. In October, Cal Fueling's counsel asked for information about certain fuel/additive codes referred to in certain documents, to provide chain of custody documents for six fuels "of our client," and to identify the customer for which certain drums/totes were blended. Ex. B-2.

According to SwRI, the demands for information failed to comply with the contract, which limits Cal Fueling's informational rights related to the project to the time period when the contract is in effect and also sought information and possession of fuels that SwRI understood belonged to other parties. ECF No. 14 para. 28. SwRI's counsel responded that the requests sought "a great deal of information concerning fuels and additives that do not belong to California Fueling" and that "the records . . . consolidate several separate fuel blends prepared for different SwRI customers." On October 30, 2019, Cal Fueling's counsel responded that the fuels were blended for Cal Fueling, and thus the information belonged to Cal Fueling and the refusal was either factually incorrect or "a tacit admission that SwRI violated its obligations to our client and used Cal Fueling's fuel and additives for testing for other clients." Ex. B-3. Counsel continued exchanging correspondence about whether SwRI would release the information through January 2020.

On January 14, 2020, SwRI's counsel informed Cal Fueling's counsel that it believed Cal Fueling violated paragraph 5 of the contract when McDuff made statements concerning SwRI test results for Cal Fueling in a December 2019 publication "California Energy & Climate Report" without SwRI's prior written approval. Ex. B-8. Paragraph 5 of the contract states, "No advertising or publicity containing any reference to SwRI or any of its employees, either directly or by implication, shall be made use of by Client or on Client's behalf without SwRI's written approval." McDuff denies making any claims in such a publication and states he is not familiar with such a publication. Def. Ex. B ¶¶ 9-10. McDuff admits making a statement about the fact that SwRI tested

its product and Best's product in an article in *Inside EPA*, and asserts his statement was made in California and has no Texas connection. *Id.* ¶¶ 11-13. The article states, in relevant part, "'They said our product partially mitigated NOx in their fuel. When we tested it in our fuel, which is required by law, it fully mitigated NOx,' he says, noting that the Southwest Research Institute (SRI) conducted the testing of the VESTA product. To the contrary, Best Corp.'s additive products showed no mitigation of NOx, according to CARB's tests and SRI tests, McDuff says."

McDuff again requested information from SwRI concerning the Cal Fueling Project in February 2020. Fanick Aff. ¶ 22; Ex. A-15. He asked Fanick to verify whether Cal Fueling has the sole rights to EM-10274-F.

Cal Fueling came to believe that SwRI violated the contract and misappropriated Cal Fueling's trade secrets by providing its biodiesel blend and its NOx mitigating additive to Innospec, a competitor. On July 16, 2020, Cal Fueling, through counsel Andrew Jablon, telephoned SwRI's counsel and told him that Cal Fueling considered SwRI's disclosures to a competitor to be both a breach of the parties' contract and a misappropriation of Cal Fueling's trade secrets. ECF No. 1 at 29 ¶ 2. Jablon told SwRI's counsel that it did not want to sue, but would do so if necessary, and that to resolve all claims without litigation, Cal Fueling was seeking the return of all sums paid by Cal Fueling to SwRI. *Id.*

SwRI filed this lawsuit against Cal Fueling in Texas state court on July 20, 2020, seeking a declaratory judgment and monetary damages.[2] The petition states that the "action primarily seeks declaratory relief" and that "SwRI seeks an award of damages and attorney's fees in an amount less than $75,000." Petn. ¶ 2. It alleges that, following termination of the contract, Cal Fueling has made repeated, non-judicial requests for information from SwRI, in contravention of contract

---

[2] SwRI relies on additional communications between the parties from July 21, 2020 through August 28, 2020, but these contacts were after suit was filed, and thus are not considered.

provisions limiting Cal Fueling's information rights to the term of the Contract. *Id.* ¶ 12. The petition alleges that Cal Fueling has further caused publications to reference SwRI without its prior consent, in contravention of contract terms prohibiting Cal Fueling from advertising or publicizing any reference to SwRI without its prior written consent. *Id.* ¶ 13. For the breach-of-contract count, SwRI alleges that it fully performed all obligations under the Contract, or alternatively, SwRI's performance was excused by the prior material breach of the Contract by Cal Fueling. *Id.* ¶ 25. SwRI alleges that Cal Fueling has breached the Contract as described and seeks recovery of all damages resulting from Cal Fueling's breach of contract, as well as attorney's fees. *Id.* ¶¶ 26, 27.

The petition further seeks declaratory relief, alleging that "California Fueling has made unsubstantiated claims that SwRI misappropriated a biodiesel fuel, designated and coded by SwRI as EM-10198-F" that "has nothing to do with California Fueling or California Fueling products or intellectual property." *Id.* ¶ 14. The petition alleges that nevertheless, Cal Fueling has demanded that SwRI refund a portion of the moneys expended on the Project to Cal Fueling. *Id.* The petition asserts that "SwRI has fully earned the monies California Fueling paid in connection with the Project and there is no basis for the claimed refund." *Id.*

The petition asserts a cause of action for declaratory judgment to "terminat[e] the controversy and resolv[e] uncertainty in the parties' legal relations going forward." *Id.* ¶ 17. SwRI requests that the Court enter a declaratory judgment that (1) SwRI in using biodiesel EM-10198-F did not, in any manner, misappropriate or use any Cal Fueling product or intellectual property as Cal Fueling has no right, title or interest in EM-10198-F and EM-10198-F bears no relationship to Cal Fueling; (2) the Contract has terminated and Cal Fueling's information rights concerning the project have ended; (3) SwRI performed the Contract and SwRI's fees were fully earned such that Cal Fueling is not entitled to a refund of any amounts paid to SwRI under the Contract; and

(4) the Contract includes an obligation that survives the termination of the Contract not to publicize reference to SwRI without SwRI's prior written consent, and Cal Fueling has no right to use SwRI's name absent SwRI's prior written consent. *Id.* ¶ 20. It further states, "This declaratory judgment action is intended to definitely determine the parties' rights with respect to the Contract and Project and to end Cal Fueling's claims against SwRI concerning its purported intellectual property." *Id.* ¶ 21.

Cal Fueling timely removed the action on August 20, 2020. SwRI moved to remand, arguing that the amount-in-controversy requirement was not satisfied, and the Court denied the motion, finding that diversity jurisdiction was established. ECF No. 17. Cal Fueling moves to dismiss the case for lack of personal jurisdiction or, in the alternative, for a transfer of venue to California. SwRI opposes both motions.

### Motion to Dismiss for Lack of Personal Jurisdiction Analysis

**A. Applicable Law**

There is personal jurisdiction if the state's long-arm statute extends to the defendant and exercise of such jurisdiction is consistent with due process. *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Id.*[3] Due process requires that the defendant have "minimum contacts" with the forum state (*i.e.*, that the defendant has purposely availed himself of the privilege of conducting activities within

---

[3] Texas's long-arm statute specifically provides that, "[i]n addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:
    (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
    (2) commits a tort in whole or in part in this state; or
    (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.
TEX. CIV. PRAC. & REM. CODE § 17.042.

the forum state) and that exercising jurisdiction is consistent with "traditional notions of fair play and substantial justice." *Id*.

"Minimum contacts" can give rise to either specific jurisdiction or general jurisdiction. In this case, Plaintiff relies on specific personal jurisdiction. Specific jurisdiction may exist "over a nonresident defendant whose contacts with the forum state are singular or sporadic only if the cause of action asserted arises out of or is related to those contacts." *Id.* In other words, such jurisdiction exists "when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Id*. "[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.*

> There is a three-step analysis for the specific jurisdiction inquiry:
>
> (1) whether the defendant has minimum contacts with the forum state, *i.e*., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Id.* at 271. If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable. *Id.*

The inquiry whether a forum state may assert specific jurisdiction over a nonresident defendant "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014). The relationship must arise out of contacts that the defendant itself creates with the forum state, not contacts between the plaintiff or third parties and the forum state and not the contacts the defendant makes by interacting with other persons affiliated with the state. *Id.* at 284. Thus, the minimum contacts analysis looks to the defendant's

contacts with the forum state itself, not the defendant's contacts with persons who reside there. *Id.* The plaintiff cannot be the only link between the defendant and the forum. *Id.*

As the party seeking to invoke the power of the court, Plaintiff "bears the burden of establishing jurisdiction, but is required to present only *prima facie* evidence." *Pervasive Software, Inc. v. Lexware GmbH & Co.*, 688 F.3d 214, 219 (5th Cir. 2012) (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006)). "In determining whether a *prima facie* case exists, this Court must accept as true [Plaintiff's] uncontroverted allegations, and resolve in [its] favor all conflicts between the [jurisdictional] facts contained in the parties' affidavits and other documentation." *Pervasive Software*, 688 F.3d at 219-20. A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim. *Seiferth*, 472 F.3d at 274.

In determining whether a foreign company should be required to defend itself in a suit in Texas arising out of a contract between itself and a Texas company, each case must be decided on its own facts. *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1066 (5th Cir. 1992). "[W]ith respect to interstate contractual obligations, parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). In other words, where the defendant deliberately has engaged in significant activities within a State or has created continuing obligations between himself and residents of the forum, he has availed himself of the privilege of conducting business there. *Id.* at 476. In breach-of-contract disputes, the "purposeful availment" analysis turns on a "highly realistic" assessment of the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."

*Sayers Constr., L.L.C. v. Timberline Constr., Inc.*, 976 F.3d 570, 573 (5th Cir. 2020) (quoting *Burger King*, 471 U.S. at 479).

## Analysis

Plaintiff SwRI contends that "all events that concern this dispute have occurred in Texas." SwRI relies on the following evidence.

Cal Fueling (1) visited San Antonio to interview SwRI to evaluate SwRI as a potential contractor, interview SwRI's employees, and inspect SwRI's testing facilities (Doc. 7, Ex. B at para 6); (2) designed, directed, and coordinated testing to be conducted at SwRI's San Antonio facilities (Fanick Decl. at Exs. A-4, A-5); (3) visited SwRI's facilities in San Antonio for weeks at a time to oversee and direct the fuel blending and testing processes (Fanick Decl. Ex. A-8, A-10, A-12); (4) occupied an office at SwRI's San Antonio facilities assigned to its CEO Mr. Patrick McDuff due to his extended visits in connection with testing oversight (Fanick Decl. para 13); (5) executed revisions to the contract in San Antonio (Fanick Decl. at Ex. A-10); (6) shipped its product to SwRI's San Antonio facilities for testing; (7) made checks and directed payments to SwRI in connection with the services performed in San Antonio to its principal office in San Antonio; (8) submitted instructions directing changes to be performed to the testing being conducted in SwRI's San Antonio facilities (Fanick Decl. Ex A-7, A-12); (9) abandoned its additive at SwRI's San Antonio facilities, despite SwRI's requests to return the product or designate an address to where it could be shipped (Fanick Decl. at para. 6, 11); and (10) directed numerous informational requests to SwRI that failed to comply with the time limitations and termination provision of the Contract (Fanick Decl. at Ex. A-13, A-15).

In contrast, Cal Fueling contends that SwRI's performance in Texas is not relevant, and the only relevant contacts between Cal Fueling and Texas are that it (1) entered into a "one-time

contract" with SwRI to perform testing mandated by a California agency, and (2) Cal Fueling's CEO traveled to Texas once before the contract was signed and then later to supervise the testing of its product.

The Fifth Circuit has held that negotiating and closing a contract with a forum resident by sending communications into the forum state are insufficient to establish specific personal jurisdiction for a breach-of-contract claim, at least if the contract does "not contemplate a long-term relationship with . . . continuing obligations and wide-reaching contacts." *Stuart v. Spademan*, 772 F.2d 1185, 1193 (5th Cir.1985). The contract at issue here did not contemplate a long-term relationship with continuing obligations and wide-reaching contacts. Cal Fueling was not looking to do business in or cause economic activity within Texas. It sought only to obtain testing under California's ADF standards for eventual certification of its product in California. Cal Fueling had only three possible lab options for obtaining the required testing. SwRI was its preferred choice, but Cal Fueling did not care that SwRI was located in Texas or that it would do the testing in Texas. The whole purpose of the testing and the contract was to obtain results following CARB protocols that would be sent to CARB in California.

Further, Cal Fueling argues that "[SwRI's] Texas location was irrelevant, and this case thus falls into the category of cases discussed in *Holt Oil*, where mere fortuity that one company happens to be a Texas resident, coupled with that company's unilateral performance, is not enough to confer jurisdiction." *Moncrieff Oil Int'l v. OAO Gazprom*, 481 F.3d 309, 313 (5th Cir. 2007) (citing *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986)). A foreign defendant who hires a Texas resident to perform services does not necessarily establish minimum contacts even though the Texas resident will perform his contractual obligations in Texas, when the resident's activities in Texas "would appear to constitute unilateral partial performance." *Jones v.*

13

*Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1069 (5th Cir. 1992) (citing *Barnstone v. Congregation Am Echad*, 574 F.2d 286, 288 (5th Cir. 1978) (Texas architect hired to design a synagogue in Maine)); *see also Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 489 n.2 (5th Cir. 2018) ("[a]ny partial performance by [the plaintiff] in Texas is insufficient to establish jurisdiction, citing *Nerium Int'l, LLC v. Kum Sun*, No. 05-13-00427-CV, 2014 WL 1789882, at *3 (Tex. App. May 2, 2014) ("[E]vidence that [plaintiff] performed its contractual obligations in Texas improperly focuses on its own activities, not [defendants'], and is not sufficient to establish [defendants'] contacts with Texas.")).

In *Stuart v. Spademan*, 772 F.2d 1185, 1193 (5th Cir.1985), the defendant entered into a contract with a forum resident to modify its ski bindings, shipped its ski bindings to the plaintiff in Texas for modification, exchanged phone calls and letters with the plaintiff about the patent, and the contract had a Texas choice-of-law provision. The Fifth Circuit found the shipment of the bindings to Texas to be of little weight, the payments into the forum to be insignificant, and the exchange of communications insufficient, noting that the contract did not contemplate a long-term relationship. The Fifth Circuit has similarly held that "mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient" to establish minimum contacts. *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004).

SwRI relies heavily on *Polythane Systems, Inc. v. Marina Ventures International*, 993 F.2d 1201 (5th Cir. 1993), asserting that the Fifth Circuit found that a defendant's decision to seek out a Texas business and contract for services that will be performed in Texas is sufficient to find specific personal jurisdiction. In that case, plaintiff PSI made foam in Texas to ship to Maryland

14

to be used in docks, and when problems surfaced with the docks, it filed a declaratory judgment action seeking judgment that its foam was not defective. The Fifth Circuit held that the Maryland defendants purposefully availed themselves of the privilege of conducting business in Texas because the mixing and packaging of the foam occurred in Texas and the title passed in Texas, and the buyer-seller relationship continued for over three years. *Polythane* is distinguishable because the economic relationship in *Polythane* was longer term than in the present case – over three years – and the Fifth Circuit found it important that title passed in Texas. Further, the declaratory judgment action and the counterclaims stemmed from the sales of the foam.

SwRI fails to establish that its causes of action arise out of or relate to Cal Fueling's purposeful forum-related contacts. For the exercise of specific jurisdiction to comply with due process, "the suit must arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F.*, ––– U.S. –––, 137 S. Ct. 1773, 1780, 198 L.Ed.2d 395 (2017). In *Bristol-Myers Squibb Co*, the Supreme Court reiterated that "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id*. In other words, there must be an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum state." *Id.* at 1781. "What is needed is a connection between the forum and the specific claims at issue." *Id.*

Cal Fueling complains that SwRI seeks to rely on the contract and the fact that Cal Fueling sought SwRI's performance in Texas to establish purposeful availment but bases its suit on contacts taking place "after the termination of the contract." Docket no. 14 para. 65. Though it admits that SwRI's claims arise out of or relate to the contract in a general sense, Cal Fueling contends that the contacts that form the basis of SwRI's suit would not allow Cal Fueling to

15

reasonably anticipate being haled into court in Texas. It argues that asking for information, failing to pick up its additive, mentioning SwRI in California in a publication about California, and making a settlement demand phone call to Texas are insufficient to establish minimum contacts. The Court agrees.

SwRI's non-misappropriation claim is based on SwRI's conduct, not Cal Fueling's, and the breach-of-contract claim is based on a single statement made by McDuff in California over a year after the contract terminated. Cal Fueling could not reasonably anticipate being haled into Texas courts based on SwRI's conduct or based on this single statement. In addition, Cal Fueling's post-contract information requests from SwRI related to its California Innospec litigation and Jablon's phone call to SwRI's counsel threatening litigation and offering to settle are insufficient to establish personal jurisdiction. *See Inmar Rx Solutions, Inc. v. Devos, Ltd.*, 786 F. App'x 445, 450 (5th Cir. 2019). Accordingly, the Court finds that SwRI has failed to establish a *prima facie* case for personal jurisdiction.

## Conclusion

Cal Fueling's motion to dismiss for lack of personal jurisdiction (ECF No. 7) is GRANTED and this case is DISMISSED WITHOUT PREJUDICE. The Clerk shall enter Judgment pursuant to Rule 58. The alternative motion to transfer venue is therefore moot.

It is so ORDERED.

SIGNED this December 22, 2020

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE